7-31-37 STRADER v. AGRICULTURE My name is April Hollingsworth and together with my co-counsel Paula Dinerstein of the Public Employees for Environmental Responsibility, we represent Gary Strader in this case. There are three primary errors made by the Administrative Law Judge in this case that I want to talk about today. First, in determining that Mr. Strader did not make protected disclosures entitling him to protection under the Whistleblower Act, the judge misapplied the standard for determining whether Mr. Strader had a reasonable belief that he was reporting a violation of the law. Second, the AJ ignored the fact that pursuant to the government regulations, Mr. Strader was a permanent employee who couldn't be terminated without just cause. The government's position on what regulations are at issue has now shifted from hearing to appeal. But even under the new regulations, he was a permanent employee. Well, the Notice of Personnel Action, the SF-50, shows that it was a term appointment, doesn't it? It shows that that's temporary. Temporary, all right. And there are two different things, Your Honor. They've been sort of used interchangeably. The judge in this case said in his decision that he was subject to 13-month terms. But these are actually terms of art. Well, the effective date that I'm looking at is January 8th, 06. Right. And that expires or terminates February 9th, 07. Right. And we don't deny that he was initially, at least according to his SF-50s, considered a temporary employee. Not that he knew that, but that that's what they put on the SF-50s. But if you look on those SF-50s in the legal authority section, it refers to the CFR, 5 CFR Section 213. And that refers to temporary employees in the accepted service. There's also another notation in the SF-50s that says EXC something NTE. This is referring to temporary employees under Section 213. And under that CFR, you can be a temporary employee for up to two years. But then you become a permanent employee. And that's the only regulation that was ever cited. So the upshot of what you're saying is that he was supposed to be a permanent employee and have a job forever. And because of his protected disclosure, they changed it to a term appointment? I'm not saying that they ever changed it because of his disclosures. I'm saying that he should have been considered a temporary employee initially. But pursuant to the regulations, after two years, he should have been permanent and therefore couldn't have been terminated without cause. And so if you take out the fact that they're saying that he's a temporary employee, then there had to be cause to terminate him, and there's no cause anywhere in the record. So the only – at least the – Well, let's assume we reject that argument. Okay. And we think that it was a term appointment. What do you have left with respect to the second prong, which is that they would have done clear and convincing evidence that they would have terminated him in any event? Right, and that was actually my third error that I wanted to talk about. The judge didn't require the agency to meet the clear and convincing standard that it would have terminated Mr. Schrader absent of his whistleblowing activities. Instead, he used the neutral non-retaliatory reason standard. And that's just, you know, as we explained in the brief, the standard for whistleblowing cases is higher for a reason. It's not like discrimination cases where you just have to offer – Well, it's kind of hard to second – I mean, he articulated the correct standard. You're just saying that in reality he applied a different standard. Yes. It's kind of hard for us to do at this level that kind of analysis in terms of weighing the evidence. I mean, we have the documents to look at. We have the timing. And so, I mean, you can say that he applied the wrong standard. What's your best argument in terms of why the standard was incorrect? In other words, what's the weakness of the proof here? Well, the weakness of the proof is they don't articulate a real reason. Their reasons change. They change a lot from when they sent a termination letter to Mr. Schrader, they said it was a budgetary reason. They didn't continue that argument in the hearing probably because we had gotten the budget documents by them which showed that there was money to continue his position. Well, I thought the argument – so correct me if I'm wrong. As I'm recalling the record, he was assigned to some project, and the project was going to be terminating the project itself in, what, June 2009 or something like that, July 2009. That's not disputed, right, that he was working on a project, and the funding for that project was coming to an end at that time, right? Well, it's not disputed that he was working on Project 17 and that Project 17 was ending at the end of June. But there's a couple things. First, he wasn't terminated at the end of June. He was terminated in April. But second of all, he doesn't contend that he was only hired to do Project 17. What he was always told and what Kevin Lansford and Joe Bennett acknowledged was the practice was to keep good employees on after the project and then send them to another project. So it's not as if he was hired to work on Project 17 and then when it was over. Getting to the merits, wasn't there a fact-finding that he could not have had a reasonable belief that the law was violated? That someone was shooting, killing lions from the air? Right, and that goes to the first error that I talked about. That A.J. said he couldn't have had a reasonable belief, but he applied an improper standard. Because the standard is based on what a person in his shoes would have known at the time he made his disclosures. A.J. basically said, well, I don't believe that the lions were shot from the plane. And so I'm finding he couldn't have had a reasonable belief. Well, not exactly. He at least articulated the correct standard. You may be saying that in actuality he didn't apply one, but he articulated the correct standard, did he not? Right, I would agree with you there. But he didn't apply it because what he did was look at evidence, the Hunter statement, during the investigation and then their testimony at the hearing. And said, well, based on this, I find that Mr. Strader couldn't have believed that they had shot lions from a plane. And so even if they did confess to him, well, he should have known that this was a photographer. Because uniformly, didn't all the testimony indicate that it was virtually impossible to shoot lions from a plane? As I read it, that was the basis for the A.J. saying that there was an absence of a reasonable belief. Well, and that's one of the things where we said there was evidence in the record that should have cast some doubt on that. I mean, first of all, they acknowledged that they saw two lions on the day in question. The gunner, the one that we contend actually shot the lions, admits that he saw two lions that day. They admit that they shot coyotes that day. And lions are bigger than coyotes. So it doesn't really... Yes, there were people who said, well, you almost never see them and it would be so hard to shoot them. But they shot coyotes that day. So why would it be impossible to shoot mountain lions? But that aside, I mean, if you take Mr. Strader at face value, they confessed to him that they shot the lions. And then later, they're like, oh no, we never said that and here's why you can't possibly shoot a lion from a plane. But in crediting the hunters' testimony and their statements, the judge, he ignored... Well, he said that their stories were consistent. They absolutely aren't consistent. And that's something objective that this panel can review. He didn't make any demeanor-based findings. He didn't say Mr. Strader looks like he's lying. He just said, well, these statements are all consistent and so I find that Mr. Strader couldn't have believed otherwise. But A, like I said, the hunters' statements are inconsistent on, I'd say, most relevant points, the timing, the weather. And then the judge ignored documentary evidence that should have detracted from that. The GPS coordinates, the NOAA weather report from that day which said that it wasn't snowing. The fact that this was the first time in three years that the hunters hadn't turned in pelts. And they all said, well, we just didn't turn in pelts whenever it wasn't convenient or the weather was too bad. And in fact, the permit that said you're supposed to bring in the pelts. So all these things, all this documentary evidence sort of went out the window. And he actually failed to consider complete implausibilities in the story. I mean, Mr. Bueller said that he hiked up 70 degrees in waist-deep snow for hours going after dogs that were obviously a lot smaller than him. And so these things are not, they don't make any logical sense. But because these findings are not demeanor-based, this panel can review them under a substantial evidence standard and look to see whether the stories are actually consistent. And I'll admit to you that they're not. In fact, every time I read them, I see more inconsistencies. In fact, the judge's own opinion where he cited testimony from Mr. Tmok and Mr. Hughesby included inconsistencies about whether Mr. Hughesby said when they went up in the plain, the dogs hadn't been released yet. So they just found the tracks and told him where the tracks were. And Mr. Tmok said when they went up in the plain, the dogs were already on the lines and had treed them. And so they told him where the lines had been treed. And actually, I see that the time I have is up, so I'll reserve the rest of my time for rebuttal. Thank you, Ms. Hollingsworth. Mr. Shunk? May it please the Court, this case is about substantial evidence, and substantial evidence supports the administrative judge's finding on page 21 of the addendum that let me ask you about the substantial evidence. Is the government's position that he would have been released anyway because his time was up and he was a term employee? And therefore, does it matter whether a protected disclosure was made? Yes, Your Honor, but kind of for both reasons. I mean, they're both independent. First, there was no protected disclosure. Second, even if there were a protected disclosure, it wouldn't matter here because he would have been released anyway. So either of those two independent reasons is a sufficient basis for this Court to affirm the Board's decision. Okay, well then let's talk about why it wasn't protected. He certainly complained that a fellow employee had violated a law. Why isn't that a protected disclosure? Because of page 21 of the administrative judge's decision, page 21 of the addendum, where the administrative judge states, I find that the appellant failed to establish that Mr. Tomok or Mr. Hughesby told him they shot two lions from a plane. That is, administrative judge... So you're saying it wasn't protected because it was found not to be true or to be improbable? I'm saying... And that it has to be true in order to be a protected disclosure? No, it has to be reasonable, objectively reasonable, which not when no one ever told you that it happened. The disclosure here was that these two employees told me that they shot lions from a plane. So that's the disclosure. It's not reasonable for an employee to say that when those conversations never happened. So therefore it wasn't protected? Exactly. Because he misheard or made a mistake in judgment or what, or made it up? Because the administrative judge found that those conversations never happened. There was no finding that it was a mistake of judgment or mishearing or credibility. This is where I'm troubled. I think it's crystal clear this was a protected disclosure unless it stops being protected because it's disbelieved. Other than that, he said my fellow employees committed a felony. But respectfully, Your Honor, that's not quite right. I mean, he... First of all, it's not... Tell me why. This is my problem. Well, Your Honor, respectfully, it's not a violation of the law. So the Airborne Hunting Act specifically says that federal employees do not violate this act. Yeah, but that's not a good answer because even the A.J. conceded that the question is not whether the law technically allows it or doesn't. It's a question of whether or not he would have reasonably believed it was a violation of law. And I think even the A.J. said, I'm letting that one go. Yeah, he could have reasonably believed. Assuming that somebody had actually told him that, he could have reasonably believed that if it happened, it was a violation of law. Right, did the A.J.? That was the A.J.'s finding. And that was incorrect, given their language. But moving on is that if the conversations never happened, if he was never told that these people shot lions out of an airplane, then that belief wasn't reasonable. Well, we don't know. He said it happened. The people who were at risk said, I didn't do that. And then the evidence disappears. Does the government condone the disappearance of the evidence? No, Your Honor, but importantly, it was the state government that lost that evidence. And Mr. Schrader testified to that, page 549 and 550. It wasn't the federal government. That wasn't my question. What about the disappearance of the skulls? I apologize, Your Honor. Mr. Schrader agrees that the state lost those skulls, not the federal government. Certainly, there's nothing being condoned about that, but it wasn't the federal government that lost these skulls. It happened to be the state government. The federal government that fired him for whistleblowing. That's not correct, Your Honor, respectfully. The federal government did not… Was it an obligation to preserve that evidence? Not on the federal government's part, Your Honor. Those skulls were turned over to the state. There's no dispute about that. The state, for whatever reason, didn't have them. But importantly, and this has come up a few times, and this is why it's a substantial evidence case, because the two employees said they never told Mr. Schrader this. Do you want them to confess to committing a felony? It is up to the administrative judge to determine what to do with this evidence, Your Honor. But isn't Ms. Pollard right that there's a different deference along for a demeanor-based credibility determination, and that those don't seem to be the kind of determinations that were made here? Isn't that correct? The first part of that, yes. The second part, no. That proposition is correct. There's a higher level, virtually unreviewable, in terms of credibility findings. Is the government's view that that's the standard of deference that's applicable here to the finding that we've been talking about this morning? Yes, but even if not, it would still be substantial evidence, because even if these weren't entitled to this virtually unreviewable deference, the result then is that's fine. They're not entitled to that standard, but the question for the court then is, is there still substantial evidence? And here there were four employees, two saying we never told Mr. Schrader this, two saying we shot the lion from the ground. That's sufficient under any standard of appellate review for there to be substantial evidence. Well, let me tell you my difficulty here, and I think it's similar to Judge Newman, but maybe a little different. Just on that point, I think you've got other arguments that may well carry the day, but just simply on that point, as Judge Newman pointed out, the people that denied having told them this clearly had a self-interest in denying that they said that or that they did that, because potentially there's criminal conduct involved. He, on the other hand, you're asking us to believe that he made this up. He made up that people told him. He reported it to his supervisors. He went to the FBI, that he was just making it up. Just weighing that kind of evidence, particularly if we're not applying the demeanor-based credibility deference to the AJ, why do we reach the conclusion the AJ reached? Because that's for the AJ to determine. Importantly, Mr. Schrader was also motivated here. The administrative judge mentioned this toward the end of the opinion, and I would respectfully point the court toward pages 299, 252, 501. In all of these instances, Mr. Schrader wants a permanent job with the agency. There's motivation there for someone else not to have a job so as to make room for Mr. Schrader. So two years before his term was to expire, he undertook this pretty elaborate lying. I mean, if you go to the FBI and make a statement that somebody told you something, I think there are potentially criminal consequences to you if you're lying about that. Am I wrong? I'm not aware, Your Honor. But this is an example of why the AJ had to make these decisions, because the AJ undoubtedly had to make a decision. What was happening? Was she to credit Mr. Schrader's testimony or the other four? Certainly biases, motivations, all of those things are involved in that determination, and it's left to the AJ. Now, that decision is entitled to deference, Your Honor. Can I ask you to just move on to another point, which kind of bothered me in terms of the facts going on here? Yes, Your Honor. The AJ seems to have relied heavily on what seems to be a pretty strong testimony that it's virtually impossible to shoot a lion from a plane, and that seemed to weigh heavily in the AJ's analysis here. Am I right? Do you agree? It was an independent ground, Your Honor. Okay. On that point, if it's so clear that it's impossible to shoot a lion from a plane, then how come the agency went through these elaborate investigations of his comments? Somebody comes in and says they claim they did it. The agency didn't say, oh, no, we don't have to investigate that. It's impossible to do it. The agency did quite an elaborate investigation of this matter, right? In part, yes. Okay. Certainly an agency… So if it's so impossible for anybody to ever believe that you could have shot a lion from a plane, why did the agency go to the trouble of even investigating this impossible thing? The elaborate investigation was not for this incident, Your Honor. So there were people who, when notified, called these employees and said, what happened? Did you do this? Undoubtedly, Your Honor. And that was diligent, and the agency stands behind that. And the fact that it looked into it doesn't somehow then cause a detriment to this proceeding. But putting that aside, there was an elaborate investigation done by Mr. Miller. Mr. Miller's investigation was done because Mr. Strader made allegations that Mr. Tomok had threatened to violently attack two of his supervisors. Mr. Tomok is the same individual Mr. Strader also alleged had shot the lions out of the airplane. So Mr. Miller came to investigate that allegation by Mr. Strader, that Mr. Tomok had, again, threatened violence or threatened to shoot up the place, I think was the language. In the process of that investigation, Mr. Miller also heard about what he considered to be misuse of federal government property, which was shooting the lions from the plane. So in the course of that investigation, he also investigated whether this occurred. That elaborate investigation was due to Mr. Strader's allegations that Mr. Tomok was threatening workplace violence, not due to this lion shooting, Your Honor. So that's why that investigation occurred. But certainly the other employees, when hearing about this, called to see what happened, as they should have done. That doesn't make it plausible or reasonable now, however. But it is mysterious. If it's impossible, why does one enact a statute prohibiting it? It gives the impression that it's a local sport, not an impossibility. Respectfully, I think the statute prohibits airplane hunting generally. So I think it's a general idea that you can't, unless there's an exception, particularly if federal employees shoot animals out of airplanes, mountain lions fitting into that broad category. And that's the purpose of the statute, as I understand it. There's just so much here that doesn't fall into place. First, they say there's too much snow to get the pelts on the ground, and yet they did remove the heads, the skulls. The statistics that counsel had provided show that out of whatever it is, 200 lions that were shot, these were the only two for which the pelts were not provided. And then again, and you say someone else had custody of the evidence, and therefore we forgive the destruction of the evidence. Meanwhile, this elaborate investigation is going on. It is very difficult to make sense out of all of this. It looks as if the only thing that this petitioner did wrong was to say that his fellow employees had done something they shouldn't have done. And everyone denies everything, and now he's out of a job. Whereas, isn't the purpose of the statute to protect those who come forward and report on wrongdoing? And if they're mistaken, then they get fired. If they're mistaken, we don't know if they're mistaken. All we know is that everyone who was on the line of being criticized, if in fact this wrong was committed, said we didn't do anything wrong. We didn't do it. It didn't happen. We know the lions were shot, so that's clear. Yes, Your Honor. It wasn't that nothing happened. They say we did it from the ground, except the snow was too deep. But nonetheless, we did it from the ground. Yes, Your Honor. And there are a few points there. There's a primary one, though, and that is this issue about the pelts. One of the hunters came back to Mr. Schrader's home that evening, and this is actually 549 and 550. And this is very important because it can appear as though there's discrepancies, but there's really not that many discrepancies, Your Honor. Well, that hunter talked to Mr. Schrader. Mr. Schrader wanted to see the pelts. The hunter explained, I don't have the pelts. I have the skulls. Mr. Schrader testifies, page 550, I had no reason for concern then. So in this briefing to the court, the lack of a pelt is all of a sudden something that is proof positive that this shooting occurred from planes. At the time, Mr. Schrader wasn't even concerned about a lack of pelts. Importantly, Mr. Bennett testified, and I believe there are 40 hunting reports in the appendix, Your Honor, that indicate pelts have been taken, but not in every case are pelts taken. And that was undisputed testimony from Mr. Bennett as well as Mr. Jensen and the two other hunters, Your Honor. So particularly with regard to the pelts, that's not evidence of anything other than the fact that it was a shooting. But what's troublesome is that everything disappeared. That's very strange with this elaborate investigation going on, the FBI and the police and everyone else, and all of a sudden the skulls disappeared. The state lost the skulls, Your Honor, and I was incorrect before. That's actually page 577 is Mr. Schrader's testimony talking about how the state lost the skulls. It's also page 302 and 303. It's Mr. Litterer's testimony. That's undisputed. It wasn't the federal government that lost the skulls. It was the state. And the trial court, the individual judge had all of this evidence before him. And there was no attempt made by the federal government to preserve the evidence that they were using against this person? For over a year, no, Your Honor. For over a year, it wasn't evidence. The federal government is simply doing what it does. It takes these skulls and or pelts and turns them over to the state, which is all that it did here, because it wasn't evidence. It wasn't evidence of anything until a year later when Mr. Schrader said these conversations happened that everyone else did not. Can I just sort of bring this full circle here? Am I correct in understanding that it's the government's position that even if this were protected activity, in other words, even if we accept kind of a lot of what we've been barring about this morning, that the bottom line is he wasn't fired because he engaged in this and that the government proved by clear and convincing evidence that his termination would have happened irrespective of any of this going down? Am I correct about that? Yes, Your Honor. Is that the government's position? Yes. He wasn't fired at all. His term simply expired. Yes, Your Honor. Right. And on that term issue then, what's your best evidence on that? I mean, the argument that whether or not this was permanent or whether or not the government was obligated to convert this temporary position to a permanent one and it didn't do something it was supposed to do or whatever. How do you get us to the point that clearly he would have been gone, all other things being equal, in any event, on July 2009? The best evidence is SS50-1126 showing that his term expired as of April 9th. Second to that is Mr. Bennett's testimony explaining that there was a new project starting, Project 22. But that project didn't fund a position. It just had money available for intermittent type of work to do this work. And this is Mr. Bennett's testimony. Page 467. I had David Taylor right there in the position where I kind of needed a person. That person's never let go. There was no position for Mr. Strader to do, and that's dispositive of that in terms of the substantial evidence standard. Importantly, also, Your Honor, in response to that question, the government did in its brief cite to a statute 5 U.S.C. 316.301, which applies to competitive service employees. Indeed, counsel is correct. This is the accepted service. That statute does not apply to Mr. Strader. It is instead under 5 CFR 213-104. I see my time's up, Your Honor. It is. Just finish your sentence. Thank you. Under that statute, when someone's term is more than 12 months, the time limits in that statute don't apply. And it's right in the language of the regulation. So second to that is that you don't somehow become a permanent employee. Something needs to happen. All of these SF50s show that he had term appointments for more than a year. Nothing in the regulations or statute could or did turn him into a permanent employee. Thank you, Your Honor. Any more questions? Okay, thank you, Mr. Schoen. Ms. Hollins-Joy. Thank you. To start with, I want to actually read from the CFR that we've just been talking about. So assuming, as the government's backseat, that Section 213 applies, what it says is, agencies may make temporary appointments for a period not to exceed a year unless it's not applicable. Since acceptance provided in Paragraph B-3 of this section, agencies may extend temporary appointments for no more than one additional year, 24 months of total service. So it's just not correct that he could continue to be a temporary employee forever. So once he's not a temporary employee, then the government has to have a legitimate or a non-retaliatory reason, has to have cause deterring him. And that's what we contend. Had the judge held the agency to the clear and convincing evidence standard, the agency couldn't have met that standard. As I believe I started to say before, the agency's reasons for letting him go at the time it did kept shifting. In addition to the budget, which was initially put forth, during the hearing they said, well, we decided that we didn't need to do any more predator control for the last two months of this project. And then we showed that, well, actually, that's when these animals are most vulnerable, because that's when they're fawning is May, not April, because you still have snow on the ground then. Then they said, well, we wanted to go ahead and pay him out his vacation. And then we had Therese Culver say, well, the benefits for the employees on these projects are funded through the whole project. So he should have just paid him out when he terminated in June, if that was legitimate. And they also said, well, then we could get reimbursed from the state by the end of the quarter. But anyway, these reasons kept changing. And then sometimes the reasons were just incomprehensible. And I just want to read, because I love this quote from Joe Bennett so much. When he was asked to explain why he was terminated in April instead of June, and this is a direct quote, Mr. Bennett answered, well, they basically, Endow had told us that the project was over, and maybe in a little bit of a cost saving, I don't know, just so you know. And then I think, if I'm not mistaken, and this may be out of my realm of expertise, there's like a not-to-exceed date on an employee. And you know, that was Gary's. And Bill Fry's was right around then, too, I think. So this is the kind of justification that they're giving for terminating him in April. When Mr. Jensen was asked the same thing, he was asked, well, why wasn't he offered the newly funded position that was funded to begin June of 2010, it was a wildlife specialist position, which is exactly what he did. And Mr. Jensen said, I don't know, it never came up. So they weren't held to prove by clear and convincing evidence that they would let him go in April of 2009. You're saying there's a different argument. I mean, there's the question of whether or not there were term employments and they would have necessarily been obligated to hire him for a different position. But then you're saying just that three-month period, though, is a separate kind of different issue, different question. Right, I mean, I think there's three issues with relation to his termination. Was he actually something less than a permanent employee? And if he wasn't, if he was a permanent employee, then they needed to have cause. And there's never been any... Right, but let's assume we reject that based on the statistics. So then, yes, there is the argument that, well, the project ended June 30th, but like I said, they didn't terminate him June 30th, they terminated him in April. There's a lot of testimony about why that happened. I'm sorry, I can't... But they actually, he continued to use his leave then through June, right? Well, he was no longer an employee as of April 9th. So they just paid him out his leave in this lump sum. And just to remind the court of how this happened, according to Mr. Schrader, and he documented it, he was told on March 6th, you're being terminated as of June 30th. And he asked Mr. Jensen at that time, is this because I went to the FBI? Mr. Jensen nods his head. So he immediately goes and files a complaint with OSC, and he tells this whole story that that's exactly what happened. Now Mr. Jensen says, I never told him he was going to be terminated June 30th, it was always April 9th. But not only did Mr. Schrader write in his OSC complaint, I was told that he'd gone June 30th, he sent an email to Deidre Teesey, who was the benefits manager, and said, oh, looks like I'm going to be out of here as of June 30th, and he CC's Mr. Jensen on it. So it doesn't make sense that someone who thinks, who's making up a story, would CC the person who said they were going to be gone in April, that they were going to be gone on June 30th. So he files this OSC complaint, and then I think about ten days later, Mr. Jensen comes back and says, oh no, actually, you're going to be gone as of April, and he gave no explanation for the change in the date. And this change, they contend, never happened, but at any rate, we've tried to get straight answers for why there was a change, or why April as opposed to June, and we've never gotten a straight answer. In addition to the shifting reasons, and in some cases, really no reason for why April as opposed to June, the AJA also aired, he basically put the burden on Mr. Schrader to prove that there was retaliatory motive, rather than on the agency to prove they didn't have a retaliatory motive. And so with respect to that, I want to just go back to Ken Miller's investigation, and correct the record, because counsel said that he was investigating a complaint that Mr. Schrader had threatened somebody, and that's not what Mr. Miller testified to. I thought it was that Mr. Twum, some other person, not that Mr. Schrader had... Ken Miller testified, and no one else knew what he was talking about, but he testified that the purpose of my investigation was, and we cited it on page 50 of our opening brief, he said that he was assigned by Gary Bithauer to determine whether Mr. Twum had threatened Mr. Bennett. And that this issue of the aerial hunting, which he didn't even know whether or not it was illegal, was just sort of a side issue. So to the extent, you know, the agency wants to raise this adequate investigation as showing that they didn't have a retaliatory motive, it wasn't an adequate investigation. Mr. Miller didn't even know what he was investigating or whether or not it was improper. Any more questions? Okay. I think we have the arguments. Okay. Thank you, Your Honor. Thank you, Ms. Armstrong for Mr. Schrader's case that was taken under submission.